RHODE ISLAND HOSPITAL TRUST CO., Exr., vs. ROSALIE M. HOPKINS.

JULY 1, 1915.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1)   Probate Appeal.   Person "Aggrieved."

Where under a will testator devised and bequeathed all of his estate other than certain direct pecuniary legacies to a trustee who was also executor, an appeal from a decree of a probate court fixing an allowance for support of the family of testator, based upon the interest of appellant, both as trustee and executor, will lie, under Gen. Laws, 1909, cap. 311, § 1, giving an appeal to any person "aggrieved" by a decree of a probate court.

(2)   Probate Appeal.   Support of Family.

In a probate appeal upon the question of the allowance under Gen. Laws, 1909, cap. 313, §§ 7, 8, for the support of the family for the term of six months next after the decease of testator, evidence considered and held—

that the allowance by the probate court and by the jury on appeal was unwarranted.

*Held*, further, that it appeared the widow had received under the will during. the period of six months after decease of her husband a sum adequate for her reasonable support.

*(3) Probate Appeal. Support of Family.*

Gen. Laws, 1909, cap. 313, §§ 7 and 8, providing for the support of the family of a decedent for the term of six months next after his decease, does not contemplate taking the estate from creditors or modifying the will or changing the course of property, but by the words "until the same can otherwise be provided for" show a plain indication by the legislature to limit the granting of allowances to cases where there is no adequate provision for the support, so that a provision for support is necessary during the six months period.

*(4) Probate Appeal. Support of Family.*

In an appeal from a decree of a probate court making an allowance for the support of the family of a decedent for the term of six months next after his decease, it was error to instruct the jury that they were for the time being the probate court in control of the estate on this particular matter, and that "the statute says an allowance shall be made and it is obvious that there is a tremendously wide discretion allowed to the court" since the functions of the jury were confined to the consideration of the facts under instructions of the court, as to the meaning of the statute, and in such instructions the restrictive portions of the statute were ignored.

Johnson, C. J., and Sweetland, J., dissenting.

Probate Appeal. Heard on exceptions of appellant and sustained.

Parkhurst, J. This cause is before this court upon a bill of exceptions, setting forth numerous exceptions taken to the rulings of a judge of the Superior Court in the course of the trial before a jury of an appeal from a decree of the probate court of the city of Cranston, entered September 5, 1913, granting the sum of $10,000 to Rosalie M. Hopkins, widow of Lyman R. Hopkins, late of said city of Cranston, "for the support of the family of said Lyman R. Hopkins for the term of six months next after the date of the death of said deceased." From this decree the Rhode Island Hospital Trust Company, the executor and trustee named in the will of said Lyman R. Hopkins, representing itself to be interested

:in the estate of said deceased in its capacity as executor and trustee duly claimed its appeal as such executor and trustee, and thereafter perfected the same according to law whereby the said appeal was duly entered in the Superior Court .sitting in Providence County.

Said appeal was thereafter, upon claim for a jury trial assigned for trial before a jury, and the jury returned a verdict in favor of the said Rosalie M. Hopkins for the sum of $10,500 "as an allowance during the first six months after the decease of said Lyman R. Hopkins;" and the jury further found specially: "That the provision of the will of Lyman R. Hopkins contemplating the payment to his widow of .$2,000.00 and the use of the house in Brooklyn and its furnishings during the first six months after his death was not a reasonable provision for continuance of her support during that period." The appellant thereupon duly filed its motion for a new trial, and to set aside the special finding of the jury, upon the grounds that the verdict was against the law and the evidence and the weight of the evidence; that the amount awarded by the jury was grossly excessive and represented a use and abuse of discretion not warranted by the law and the evidence and the weight thereof; and that the special finding of the jury was against the evidence and the weight thereof and against the law. This motion was heard and denied by the judge who tried the case upon .appeal; and thereupon the appellant duly filed its bill of exceptions, and brought the case to this court thereon.

There is no substantial dispute or conflict of testimony upon the facts of this case. Lyman R. Hopkins died on the 26th day of April, 1913, a resident of the city of Cranston, in this State, at the age of eighty-nine years. He and his wife had formerly for many years lived for about one-half of each year in a house owned by him in Brooklyn, N. Y., and for about the other half of the year in a cottage owned by him at Lakeview, Maine. Some two years before his death he and his wife had come to live in the house of his grand-daughter and her husband, Mr. and Mrs. Benjamin T.

Peck, in Edgewood, Cranston; during most of that time
Mr. Hopkins was ill from troubles incident to old age, and
was confined to the house and under medical treatment for
most of that time until he died there in 1913.   The house in
Brooklyn, where for many years Mr. and Mrs. Hopkins had
their winter home, was a substantial stone front residence of
three stories and a basement, in the best part of the city on
the Park slope; in Lakeview, Maine, they occupied a
cottage which was testified to be the best house in the
village and was comfortable and suitable for their use.
Both in Brooklyn, and at Lakeview, it appears that they
lived in a quiet and modest manner, comfortably and
suitably according to their years and desires, but without
incurring great expense.   It appears from the testimony of
Mrs. Hopkins that their ordinary living expenses, prior to
their coming to live in Cranston, were about $2,000 per
year, including both Brooklyn and Lakeview; and this is
the only evidence on the subject.   This is to be taken as
exclusive of rent, as Mr. Hopkins owned both houses.   As
to their living expenses in Cranston, during the two years
there, we have no evidence before us.   Mrs. Hopkins in her
testimony makes no complaint as to their method of living
and says that they always lived comfortably; and that
since her husband's death she has lived just the same as they
always lived before.   Mrs. Hopkins, the appellee, was the
wife of Mr. Hopkins by a second marriage, and was in her
seventy-third year at the time of his death.   There were no
children by this marriage.   The immediate family at the
time of Mr. Hopkins' death consisted of himself and his
wife; there were none others dependent upon him.   They
had one servant who had lived with them before coming to
Cranston, and who lived with them also at Mr. Peck's
house in Cranston and had special charge of Mr. Hopkins,
acting as his nurse, giving him medicine and needed care
(somewhat assisted by Mrs. Hopkins) and cooking for him
such things as were suitable for his condition and as his
physician desired.   They appear to have usually kept only

one servant during their living in Brooklyn and in Maine, and Mrs. Hopkins has usually kept one servant since her husband's death.

The house in Brooklyn was completely furnished and had been kept open during the time that Mr. and Mrs. Hopkins were living in Cranston, by certain relatives of Mrs. Hopkins who had permission to occupy it.    To this house Mrs. Hopkins returned immediately after her husband's funeral and has since made it her home, going to Maine for the summers after her husband died, as she had before been in the habit of doing.

Mrs. Hopkins has been afflicted with chronic chorea (or St. Vitus's dance) for upwards of forty years, and this has affected her speech and caused certain spasmodic movments, at times more noticeable than at other times; but it does not seem to have seriously affected her general health; and although Mrs. Hopkins says that she was very much tired out and "collapsed" as soon as she got home to her Brooklyn house, after her husband's death, the testimony of her physician who attended her in Brooklyn during May and a part of June, 1913, and who advised her to go to Maine for the summer according to her former custom, as being better for her health, shows that he was first called to attend her on May 20, 1913 (her husband died April 26, 1913, and she returned to Brooklyn immediately after the funeral or about May 1, 1913); and that at that time she was suffering from chronic chorea, grippe and nervous exhaustion; but he only attended her six times between May 20 and June 4, 1913; that he sent her some medicine of a sedative and tonic nature while she was in Maine.    His total charge for these visits was $18.

On the other hand it appears without contradiction, that when going from Brooklyn she arrived in Maine shortly after the first of June, she stopped with her sister at Milo, Maine, where she spent most of the summer, arriving there in the evening; and that on the next morning she was able to drive from Milo to Lakeview, a distance of about eight

miles and return, on the same day, over a common country road, somewhat rough at that time of year; that she spent several hours at the Lakeview cottage where she had lived in previous summers and was quite active in going up and down stairs, gathering up her things, table linen, bed clothing and other personal effects which she desired to take away with her; that she appeared to the witnesses who had known her intimately in Maine for a number of years, both at Lakeview and at Milo, to be then in substantially the same condition of health as she had been for many years past; that she was quite active, able to ride long distances in a carriage, and to go about unattended and call upon her neighbors; and that generally during the summer of 1913 and up to the last day of September when she left to go back to Brooklyn, she was well and active and in much the same condition of health as she had been for several years before, not requiring the attendance of a physician or any special attendance in going about her daily avocations. It does not appear that after her return to Brooklyn about October 1, 1913, she had any medical attendance other than one visit on October 17, 1913 (the reason for which does not appear), during the balance of the six months' period after her husband's death, which ended October 26, 1913.

Mrs. Hopkins testifies in a somewhat vague and general way that the house in Brooklyn was badly out of repair; that she had to have considerable repairs made to the plumbing, and that she expended $250 on the heating system, and that other repairs were badly needed. Her testimony which is before us in the transcript was taken in open court, before the jury, October 19–20, 1914, about eighteen months after Mr. Hopkins' death; and from anything that appears therein, as to expediture for repairs either to the plumbing or to the heating apparatus or otherwise, it is not shown that any necessity existed for making such repairs within six months after Mr. Hopkins' death, or that in fact any such repairs were made within said six months; nor is there any evidence to show that any such repairs were

paid for within said six months, or that they were not paid for out of the money which she admits that she received from the trustee (appellant) $1,000 of which was paid to her about August 9, 1913, and $1,000 about October 1, 1913. Nor is there any evidence before us that she was obliged to "raise" or borrow any money for any of her expenses, or that she expended any money other than that received from the trustee for any such expenses. It does appear however that her annual income from certain property which her husband had given her in his lifetime did not exceed $700 per annum, at the time of his death, and from her own testimony it appears that shortly after his death she bought with her own money and not out of the money received from the trustee, two Indiana Steel Bonds of $1,000 each, face value, thereby expending the value of nearly three years of her admitted income from her own property. And she also admitted that since her husband's death she had lived in the same way that she always lived with him when they lived together. Furthermore, there is undisputed testimony from several witnesses with whom she talked in Maine in the summer of 1913 that she was indignant when it was stated to her that there was a rumor that her husband had left her in destitute circumstances and that she said it was not true and that "he had not left her in destitute circumstances," that "he had provided well for her."

It is also to be noted in this connection that Mrs. Hopkins stated that just before her husband's death he gave her five Mississippi Water Power Company bonds of the face value of $1,000 each, and $100 in cash, telling her that she "would need it."

The will of Lyman R. Hopkins, after giving certain specific legacies of money to certain persons and to his granddaughter, Mrs. Peck, and his son, George L. Hopkins, and to several grandchildren and great-grandchildren, and after creating certain trust funds for the benefit of some of them, provides for his wife as follows: "Twelfth. I give, devise and bequeath to my wife, Rosalie M. Hopkins, of

Cranston, Rhode Island, my house and lot designated at No. 288 Garfield Place, New York City, Borough of Brooklyn, with all its furniture and furnishings for the term of her life, remainder to my lineal heirs, share and share alike *per capita.* I furthermore give and bequeath to the said Rhode Island Hospital Trust Company the sum of one hundred thousand dollars in special trust nevertheless for the use and benefit of my said wife, Rosalie M. Hopkins, the income from which to be paid to her quarterly during her life by my said trustee, which I consider will afford an income of not less than four thousand dollars per annum. The above gifts, devises and bequests are in lieu of my said wife's dower rights in my estate. The foregoing gifts and bequests in trust to wit: of one hundred thousand dollars, of seventy-five thousand dollars, of twenty-five thousand dollars, and of twelve thousand five hundred dollars may consist of a deposit or deposits in banking institutions, of bonds, in stocks or shares in corporations, as shall be safest in the judgment of my trustee, its officers. My desire is that the income from said trust funds shall be at least four per centum per annum.''

By the "Thirteenth" clause of the will he gives all the rest and residue of his estate to the Rhode Island Hospital Trust Company in trust with the usual powers of reinvestment and sale.

By the "Fourteenth" clause of the will after certain instructions to the trustee, it is provided as follows: "I hereby direct that the foregoing incomes or annuities payable by my said trustee, viz.: to my son, George L. Hopkins, to my grandson, George S. Hopkins, to my granddaughter, Gertrude L. Hopkins, to my granddaughter, Elsie G. Peck, and to my wife, Rosalie M. Hopkins, shall commence and be payable on and after the date of my decease.''

By the "Fifteenth" clause of the will provision is made for the ultimate disposition of the several trust funds, and of the residuary estate among the lineal heirs of the testator.

. The Rhode Island Hospital Trust Company is made trustee of all the several trusts of the will and is also named as executor of the will.

The petition of the widow for allowance under the statute, was filed in the probate court of the city of Cranston sometime in July or early in August, 1913 (the date is not given in the record), and "requests the court to make a reasonable allowance out of the estate of said deceased, for the support of his family for the term of six months next after his decease." Upon that application the decree of the probate court was entered September 5, 1913, directing the executor to pay to the petitioner the sum of $10,000 "for the support of the family of said Lyman R. Hopkins for the term of six months next after the date of the death of said deceased."

The statute under which this petition was filed and allowance was decreed is found in General Laws, R. I. (1909), Chap. 313, §§ 7 and 8, as follows:

"Sec. 7. The probate court shall make reasonable allowance out of the estate of the deceased for the support of his family, until the same can otherwise be provided for, not exceeding six months from the date of the decease, having regard to the situation of the family and the value and circumstances of the estate. Such allowance may be fixed at any time within one year after publication of notice of the qualification of the executor or administrator, upon his application or that of any party in interest. After exhausting the personal property, real estate may be sold to provide the amount of allowance decreed, in the same manner as for the payment of debts.

"Sec. 8. Such part of the personal property as the court shall allow to the widow or family of the deceased, although inventoried, shall not be assets in the hands of the executor or administrator."

Counsel on behalf of the appellee, Rosalie M. Hopkins, raises in this court, not by way of motion to dismiss, but simply upon his brief and in argument, a preliminary question upon his contention that the appellant has not such an

interest in the matter of this allowance to the widow as warrants it in taking this appeal, since it appears that no beneficiary under the will has taken an appeal; and contends that the Rhode Island Hospital Trust Company is not a person "aggrieved" under the language of Gen. Laws (1909), (1) Chap. 311: "Section 1. Any person aggrieved by an order or decree of a court of probate may," . . . "appeal therefrom to the superior court," etc. And counsel further in support of this contention refers to the provision of Chap. 313, § 8, above quoted, that "such part of the personal property as the court shall allow to the widow or family of the deceased, although inventoried, shall not be assets in the hands of the executor or administrator;" and thereupon claims that the executor is exonerated by the last quoted section from accountability for the sum of money allowed, and therefore is not "aggrieved" by the decree.

This question, as applied to the right of an executor to appeal from a decree of this character has not been raised in this State. In the case of *Babcock* v. *Probate Court*, 18 R. I. 555, the executor did appeal from such a decree of allowance and the appeal was determined on the merits, but the question of his right of appeal was not raised. In the case of *Tillinghast et al.* v. *Brown University*, 24 R. I. 179, 185, executors appealed from an order of the Municipal Court of Providence (probate court) directing them to file an inventory and account of the estate of the testator, it appearing that they were exonerated by the will from so doing. It was held, upon motion to dismiss the appeal, that the executors had the right of appeal because the decree of the probate court imposed upon them "a 'burden or obligation,' which may and probably will impose pecuniary loss or expense. It is a denial of their alleged right to be exempted from this burden, and this right is a substantial one beyond controversy. It would be narrowing unwarrantably the remedy given in the broadest language by the statute to deny the appellants a right of appeal from this decree."

While the last quoted case is not directly in point it is cited to show that this court has construed the statute of probate appeals broadly in reference to the right of executors to appeal; and we are unable to see that the executors in that case had any greater or more substantial interest than has the executor in the case at bar.

But it is to be noted in the case at bar that the testator has devised and bequeathed all of his estate other than certain direct pecuniary legacies to the appellant as trustee, upon certain special trusts; the legal title to both real and personal estate is vested in the trustee; the entire estate is disposed of and any allowance to the widow will necessarily come out of the residuary fund, which is also given to the appellant in trust for certain beneficiaries. It is to be noted also that in its claim of appeal, filed in the probate court of the city of Cranston, the appellant sets forth its interest in the estate as executor and trustee under the will, and signs as executor and trustee; so that the appeal which is founded upon this claim of appeal is in legal effect based upon its interest, both as trustee and as executor. It may well be said therefore that it has a direct pecuniary interest in the amount of money that will be diverted from its control under the trusts of the will. The principle which should govern the question is well set forth in the case of *Levy* v. *Williams,* 9 S. C. 153 (1876), where the executors, who were also trustees under the will, appealed from an order of an inferior court, making certain allowances for counsel fees to be paid to the widow's attorney and granting the widow an extra allowance; the statute provided that "any party aggrieved may appeal;" upon motion to dismiss "for want of any appealable interest or duty in the appellants," the court said, p. 154: "The ground on which the motion is asked to dismiss the appeal of the executors is 'for the want of any appealable interest or duty in the appellants.'" . . . "The order appealed from acts directly on the property, diverts it from the purpose for which it was to remain under the management of the executors." . . .

"It is the duty of the executors to carry out the purpose of the testator in the mode declared by the will, which is the power under which they act. It is true, in a proper case made, a court of competent jurisdiction may take control of the estate, or instruct the executor as to the manner in which he is to execute the will." . . . "He is not bound however to follow the action of a circuit court, directing his administration of the estate in a particular manner, but has the right to seek the judgment of the appellate court, which has the power to reverse or modify it.

"While an executor may not be bound to appeal, and may, therefore, be excused for not doing so, we cannot see how he can be prevented from questioning by appeal the order of a court which requires him to dispose of a part of the estate directed by the will to be kept in his hand for a certain designated time and purpose. If it should be held that an executor has no right to ask the judgment of the court of last resort on an order of the court below, made by consent even of all the devisees and legatees, but against his concurrence, the object of the testator in devolving upon him by the will the administration of the whole estate to the uses and on the conditions and limitations expressed might be wholly perverted and defeated.

"The executors here were charged with certain trusts, and they had the right to appeal from any order changing or in any way affecting their execution according to the intent of the testator apparent in the will."

See *Estate of Levy*, 141 Cal. 646, where the court expressly held that executors have the right of appeal "from an order setting apart from the property of the deceased a homestead for the use of the surviving wife for and during the period of administration of said estate and until its final distribution," citing *In re Heydenfeldt*, 117 Cal. 551. See, also, *Reinig* v. *Hecht*, 58 Wis. 212, 215; *In re Stevens*, 114 App. Div. 607, 613, affirmed, 188 N. Y. 589.

The appellee's counsel cites no cases which in our opinion support his contention in this regard. In the case of *In re*

*Dougherty's Estate*, 34 Mont. 336, the appellant was widow and administratrix of the estate, and appealed in both capacities from an order of an inferior court cutting down her allowance as widow; it was held that she had a right of appeal in her individual capacity, and that as administratrix she had not.   Clearly in this case the order was for the benefit of the estate in her hands as administratrix.   In *Appeal of Abbott*, 97 Me. 278, it was found that the petition, which was by a brother of deceased (not by an executor), showed no legal interest in the estate, and the appeal was dismissed.   In certain other cases cited where orders of distribution were appealed from by an executor or administrator, it was held that the executor or administrator had no appealable interest, so long as the decree of distribution does not surcharge him, or make a distribution larger than he admitted to be due; or where there was no dispute as to the parties rightfully entitled to the money.   *Wick's Estate*, 50 Pa. Super. Court, 614; *Bower's Estate*, 48 Pa. Super. Court, 394; *Wilson Ex'r* v. *Board of Regents*, 46 Colo. 100; *Estate of Williams*, 122 Cal. 76; *Stilphen, Appellant*, 100 Me. 146, 148.

Our conclusion is that the appellant in this case, as executor and trustee under the will of Lyman R. Hopkins had a right of appeal, in this matter, and that on this appeal is properly before this court.

The appellant, at the conclusion of the evidence before the jury, moved for the direction of a verdict in its favor; and also in the first three special requests for instructions to the jury, asked that the jury be instructed:

"1.   That under the evidence offered in this case the appellee, Rosalie M. Hopkins, is not entitled to a verdict in her favor:

"2.   That the evidence in this case fails to show that the appellee, Rosalie M. Hopkins, did not receive a reasonable allowance for her support out of the estate of Lyman R. Hopkins:

"3.   That the evidence offered in this case shows that the appellee, Rosalie M. Hopkins, received a reasonable

allowan̦ce for her support from and after the death of her husband, Lyman R. Hopkins, by virtue of the provision of his will, and therefore she is not entitled to further or additional support out of his estate."

The denial of the motion for direction of a verdict in its favor, and the refusal of these three requests for instructions to the jury are the basis of appellant's exceptions Nos. 7–10, inclusive, and thereunder the appellant raises its main contention that the statute (Chap. 313, § 7), above quoted, viz.: "Sec. 7. The probate court shall make reasonable allowance out of the estate of the deceased for the support of his family, until the same can be otherwise provided for not exceeding six months from the date of the decease, having regard to the situation of the family and the value and circumstances of the estate," does not mean that under all circumstances, and at all events, the probate court "shall make some allowance for the support of the family; and that under the circumstances in this case as shown by the evidence, the widow was already provided from the date of her husband's death with a "reasonable allowance" for her support, and was entitled to no further allowance.

(2)    The evidence, already set forth above, shows that just before his death, her husband, having already at various times given to his wife several bonds of considerable value, which she still owned, gave to the appellee 5 Mississippi Water Power bonds, each of the face value of $1,000 and $100 in cash, saying to her that "she would need it." We think that in regard to this last gift, just before his death, the husband had in mind the imminence of his decease and that he intended to provide for his wife a fund for her needs just at that time, and until the income provided for her under his will should become available. The evidence fails to show that she was not fully provided for during the period of six months after his decease, out of the moneys derived from her husband's estate. On the contrary, it does appear that she was able to invest her private income (which was about $700 per annum, including the income from the five

bonds last above mentioned) in 2 Indiana Steel bonds of $1,000 each; and there is nothing to show that the "support" which she actually had was paid for out of her private means, and was not paid for out of the moneys received from the trustee under her husband's will.   There is nothing to show that she had to use any of her own money for her support, or to raise any money on her bonds, by borrowing, or by selling any of them; and it further appears that she had not expended all of the $2,000 she received from the trustee during six months after her husband's death.   Nor is there anything to show what her "support" cost her during the six month's period, other than her statement that she paid her sister, with whom she boarded in Maine from June to September 30, 1913, the sum of $100 which was presumably paid after she received her income from the trustee, there being nothing to the contrary.   The principal items of expenditure (with the exception of a doctor's bill of $18 above referred to) about which she has testified at all in detail relate to repairs of plumbing, and renewal of heating apparatus in the house in Brooklyn of which she became the life-tenant under her husband's will.   She does say that she expended money for plumbing (say $50) and $250 on the heating; but it nowhere appears that these sums were expended during the six months after her husband's death, or that they were not paid out of the moneys received from the trustee; so that it becomes unimportant to decide whether in any event these items of repairs and improvements to the property owned by her as life-tenant could be considered in relation to the matter of her "support." In none of the numerous cases cited upon the briefs does it appear that any such items as these, in the nature of permanent repairs and improvements to the life-tenement of the widow, have ever been considered as a basis for estimating the amount of the "support" to which a widow is entitled under the statute of any state.

Nor is there any evidence that the state of health of the widow was such, after her husband's death, that she required

or received any unusual or expensive care and medical treatment. On the contrary, as shown above, it appears that she did not have any medical attendance until several weeks after her husband's death, and that during the summer which she spent in Maine she was in her usual state of health and expended no money for medical attendance or other special care or attendance made necessary by her state of health, and did not then need any such attendance or care.

This case is one of first impression in this State. The statute under which the allowance is made is of ancient origin in our law; at least as early as 1798, a statute using substantially the same language was in existence (See Laws of R. I. 1798, p. 303, § 24), as follows: "That the Court of Probate shall, in the settlement of the accounts of executors and administrators, make reasonable allowance for the support of the family of the deceased, after his or her decease, until the same can be otherwise provided for, having due regard to the situation of the family, and the value and circumstances of the estate, not exceeding the term of six months . . ." This statute appears in substantially the same language, with slight and unimportant verbal changes in the various revisions of our laws down to the General Laws of 1896, Chap. 216, § 6; and in the form already above fully quoted in General Laws, 1909.

The history of our practice under this statute has been fully set forth in the case of *Babcock* v. *Probate Court*, 18 R. I. 555, which was a decision under the Public Statutes of 1882, Chapter 190, § 6. Referring to this section the court says: "The latter section provides that 'In the settlement of the accounts of executors and administrators the court of probate shall make reasonable allowance for the support of the family of the deceased, after his decease, until the same can otherwise be provided for, having due regard to the situation of the family and the value and circumstances of the estate; such allowance to be made for a term not exceeding six months.

"The appellant contends that this section refers only to the reasonable discretion of courts of probate in allowing the expenses *incurred by executors and administrators* in aiding the families of their testators or intestates during the first six months after the decease of the head of the household, or, in other words, that the sums needed for the support of the family of the deceased during the period specified are to be first paid out by the executor or administrator, and that the jurisdiction of the Court of Probate is confined to the allowance of the expenses so incurred in the settlement of the account of the executor or administrator. This contention would appear to be in accordance with the literal, and we may add, the natural construction of the section. A different construction, however, was early put on the statute, under which the practice objected to by the appellant has grown up, has prevailed for many years and is now too firmly established to be overturned. We presume that the construction and practice originated in this manner: an executor or administrator, before expending money or incurring expense for the support of the family of the deceased, would naturally wish to know in advance whether the Court of Probate would deem the expenditure reasonable and, therefore, proper to be allowed in the settlement of his accounts. In such case, he would make an application to the court to decree what amount would be a reasonable and proper sum for him to expend. The court seeing that it had authority to allow what was reasonable in the settlement of the account might not unreasonably conclude that it had power to determine in advance what was a reasonable and proper allowance and to make its decree accordingly. This practice having been established, it was merely an extension of it for the court to determine the amount of the allowance on the application of the widow, perhaps at first with the concurrence of the executor or administrator and later without such concurrence and even contrary to his will."

The statute, as it now appears, as first above quoted, simply conforms to the practice, approved in the last cited case.

We think it is clear that in the consideration of the words: "reasonable allowance for the support," etc., the court had in mind what sums of money under the evidence in the case would be reasonably necessary for the support of the widow, because it finds upon the evidence before it that the allowance was not "improper or excessive."

. Although this court has not heretofore been called upon to consider in detail the construction and effect of our statute, except in the case last cited, the matter of allowances to widows has been frequently considered by the courts of other states; and while their statutes are not in any case precisely similar to ours, yet the purpose thereof is in all cases the same, viz.: to provide for the reasonable support of the widow and minor children of the deceased, if any, "during the settlement of the estate," or "until their shares can be set out to them," or "until the same can otherwise be provided for not exceeding six months from the date of the decease" (our statute). In the leading case of *Hollenbeck* v. *Pixley*, 3 Gray, 521, it was said by Shaw, C. J.: "We are not aware of any general rules regulating the discretion of courts of probate in making allowances to widows. Indeed, it depends upon such a great variety of circumstances, that it would be difficult to frame any rule, in any considerable degree general, to apply to them." And the same judge further said (p. 525), in considering that case: "Though no general rules have been or can be established, regulating this judicial discretion, yet, to some extent, the considerations of justice and expediency on which the law is founded are plain and obvious." . . . "The case supposes the decease of a husband, leaving a widow. In the great majority of cases, he will have been a housekeeper; in many a parent; in many leaving children helpless and dependent. In many cases, the widow . . . may become the head of a household and family; new duties and obligations may rest upon her, causing an immediate demand for necessaries," etc. . . . "The purpose of the statute, we think, is, to make a personal allowance to her to meet these neces-

.sities." . . . "But these are all 'circumstances,' and they are often numerous and various, to be taken into consideration by the judge, to determine whether any allowance shall be made, and, if any, what. The amount of the property left by the husband, and the amount of the separate property and means of the wife, are also important circumstances bearing on the question of her necessities." . . . "The allowance now under consideration is not made to the widow as a reward for faithful service as a wife; nor is it given out of the husband's estate as compensation to her for ill treatment by him as a husband; but it is a question solely of her actual necessities." (p. 526). "But she had no family to support, no child to provide for; all her separate property, which was very considerable, was secured to her on her marriage, and confirmed to her on the separation, and was considerably increased before the decease of her husband. No new duties devolved upon her by that event, and she incurred no additional expenses." . . . "We see no ground to question the sound discretion of the judge of probate, in declining to make her a personal allowance out of the husband's estate."

As is well said by Woerner, Am. Laws of Adm'n, Sec. 77 (2d Ed.): "These provisions for the protection of the family constitute no gift to the widow to repair any seeming injustice in the Statute of Distribution or the will of her husband, but are intended to furnish her and her minor children the means of temporary maintenance out of the estate of the deceased husband until their interest therein can be set out to them."

(3)    In *Chase* v. *Webster*, 168 Mass. 228, 230, the Massachusetts court summarizes the results of the previous opinions: Barker, J. "The power to make allowances," . . . "and the direction given by the statute is that the petition shall be dealt with, 'having regard to all the circumstances of the case,' with a necessary implication that the allowances shall be given only to relieve what, under the circumstances, are fairly to be deemed necessities." (Citations of Mass.

cases follow.) (p. 231): "These cases hold that the allowance is not to be given with the design of taking the estate from creditors, or of modifying the provisions of a will, or of changing the course which property would take under the statute of distributions, and that the allowance may be given, although the widow at the time of her husband's death is living separate and apart from him;" . . . "and that it is not made as a reward for faithful service as a wife; but it is a question of the widow's actual necessities."

*Foster* v. *Foster*, 36 N. H. 437 (1858), (p. 438): "The principle upon which an allowance is made to a widow, under the provisions of Sec. 1, Chap. 165, of the Revised Statutes, must be regarded as settled in this State. The allowance is for her present support only. It is not a gift, nor intended as a compensation for any apparent injustice to which she may be exposed by the statutes of distributions, or the will of her husband. It is to enable her to support herself until her interest in the estate can be set out to her."

*Woodbury* v. *Woodbury*, 58 N. H. 44, 45. Sawyer, J. "The statute authorizes a reasonable allowance out of the personal estate for the present support of the widow,—that is, for her support presently upon and immediately after the death of her husband, &c." . . . "An allowance is not a remedy for any apparent or anticipated injustice in the settlement of the estate, but is for the supply of those present, temporary wants, for which she has no other resource immediately after the death of her husband. It is authorized merely as a necessary provision to enable her to support herself until her interest in the estate can be set out to her."

See, also, *Haven'sAppeal*, 69 Conn. 684; *Adams* v. *Adams*, 10 Met. 170; *Drew* v. *Gordon*, 13 Allen, 120, 122; *Allen* v. *Allen*, 117 Mass. 27, 28; Woerner, Am. Law of Adm'n., 2d ed., Sec. 78, Sec. 79; *Baker's Appeal*, 56 Conn. 586, 588.

In view of these authorities and of what appears to us to be the plain and obvious construction of our statute hereinbefore fully quoted, we are of the opinion that, under the evidence in this case the allowance of $10,000 which was

made by the probate court of the city of Cranston, and which was increased by the jury to $10,500 in the Superior Court, was entirely unwarranted.  It appears from all the evidence as above set forth that the widow in this case has received from the trustee under her husband's will, during the period of six months after his decease, the sum of $2,000; that such sum was adequate for her reasonable support during that time and that in fact she was supported by that sum, in the same manner that she had been accustomed to be supported during her husband's lifetime, which was comfortable, suitable and adequate to her requirements and desires; that there is no evidence that she was obliged to use her own income or property for any expenditures for her support; that on the contrary she was able to invest and did invest shortly after her husband's death a large sum of money derived from her own property ($2,000) in bonds; and that she did not in fact expend all of the money received from the trustee under the will during said six months for her support. We are of the opinion that the words of the statute, "until the same can otherwise be provided for," are a plain indication of the intention of the General Assembly in the enactment of this statute to limit the granting of allowances to widows to cases where there, is no adequate provision for her support so that a provision for her support is necessary during the six months' period.  We are of the opinion that the allowance of $10,000 by the probate court was entirely unwarranted under the law and the facts of this case and was tantamount to a gift of that sum out of her husband's estate in addition to the adequate provision already made for her under the will; and that the allowance made by the verdict of the jury of $10,500 was likewise and for the same reasons entirely unwarranted under the law and facts, and that the jury was governed in its award solely by the size of the testator's estate, without reference to the fact that the widow was already provided with a reasonable sum for her support out of her husband's estate; and that the allowance by the jury was tantamount to a gift of $10,500 to the widow out of her husband's estate.

Certain other exceptions relating to the instructions to the jury will be considered in this connection because it seems to this court that the trial judge erred in such instructions, and gave to the jury an entirely erroneous impression as to its powers.

(4)

Exception 20 has reference to the following language: "You, as has been said with regard to one phase of the settling of this estate, for the time being are the Probate Court." (Transcript, page 98) . . . "For the time being you are passing on this thing as the Probate Court in control of this estate on this particular matter." (Transcript, page 104.)

Exception 21 has reference to the following language: "The statute says that an allowance shall be made, and then by its terms gives a very, very wide latitude to the Probate Court in deciding on the amount. You have heard that read twice, and it is obvious on hearing it that there is a tremendously wide discretion allowed to the court." (Transcript, pages 100 and 101).

We think that these instructions were clearly erroneous. The jury is not the probate court; the functions of the jury are confined to the consideration of the facts of the case under the instructions of the justice presiding at the trial. It was his duty to instruct them in the law, and upon the meaning and construction of the statute under consideration. He ignored certain restrictive portions of the statute, which we have heretofore commented upon, viz.: the words, "until the same can otherwise be provided for," and failed to instruct the jury properly as to their effect; and by these general instructions gave to the jury such a wide latitude of discretion that it is quite plain they might well understand that they could do as they pleased in the matter of the award. These instructions may well account for the action of the jury in making their award, as well as in their special finding above quoted: in our opinion both the award and the special finding are entirely unsupported by the evidence in the case.

The appellant's exceptions Nos. 7, 8, 9, 10, 20, and 21 are sustained; in view of the decision, the other exceptions need not be considered; we are of the opinion that the verdict of the jury awarding the sum of $10,500 to said widow, and also the special finding of the jury should be set aside; and that the case should be remitted to the Superior Court with instructions to enter its decree reversing the decree of the probate court of the city of Cranston entered September 5, 1913, awarding the sum of $10,000 to the said Rosalie M. Hopkins. The repondent will have an opportunity to show cause why this order should not be made on Tuesday, July 6, 1915, at ten o'clock in the forenoon.

SWEETLAND, J. (dissenting). I am forced to dissent from the opinion of the majority of the court. That opinion places upon the statute in question a narrow and illiberal construction not in harmony with the practice which has formerly prevailed in this State and inconsistent with the doctrine generally announced by the courts of this country; that statutes of a similar nature shall be construed liberally in favor of the widow and family of the deceased. I think it may fairly be said that while the majority opinion deals at great length with matters which are not really in controversy it fails to adequately consider the matters and the legal questions which are at issue.

Our statute differs in its terms from similar provisions in other states. It is markedly unlike a statute of Massachusetts the construction of which is taken by the majority as the standard of construction to be applied to our provision. The Rhode Island statute directs that the probate court "shall make reasonable allowance out of the estate of the deceased for the support of his family, until the same can be otherwise provided for, not exceeding six months from the date of the decease, having regard to the situation of the family and the value and circumstances of the estate." What the clause "until the same can be otherwise provided for" should be construed to mean, in its application to every set of circumstances, is not clear. I think we can

fairly say that under the liberal construction which should be given to every part of this statute, it does not mean that in all cases the duty of the probate court to provide for the support of the widow ceases if the widow has private means of her own. In the case of an insolvent estate and ample private fortune in the widow, under the direction that the allowance shall be made "having regard to the situation of the family and the value and circumstances of the estate" the probate court in making an allowance might take into consideration the fortune of the widow; but in any event that fact should not prevent an allowance to her, for a period of six months or less, until her own income is in her hands, if the same is not immediately available. Such, however, are not the facts of the case at bar, for the estate of the deceased was large and entirely solvent. The word "support" as used in the statute, in its application to an allowance to a widow from her deceased husband's estate, has somewhat the same meaning as when used with reference to the obligation of a husband to his wife. The wife is entitled to be maintained by the husband in accordance with his fortune and his station in life. So under the statute, the probate court shall grant to the widow maintenance in accordance with the value of the estate. She is entitled to subsistence even if the estate is insolvent; but if solvent it is not an abuse of the court's discretion to make an allowance to the widow for a period not exceeding six months which shall provide for her maintenance in accordance with what the wife of such deceased husband would be entitled if he was alive. The husband may not have completely observed his obligation during life, he may have entirely failed to do so; but that fact would not control the court's discretion; the court should, notwithstanding, grant to the wife support in accordance with the ample, legal, meaning of that word.

Thus, it will be seen that the Rhode Island statute is very liberal in its terms; and heretofore it has been liberally construed by probate courts without appeal to this court.

The statute of Massachusetts, however, upon the con-
struction of which the majority so largely relies, is quite
different. Under that statute the judge of probate, having
due regard to all the circumstances of the case, may grant
to the widow such of the personal estate as he "may see fit
to allow for necessaries." It appears that unlike the Rhode
Island provision the duty of the probate court to make an
allowance is not imperative, but merely discretionary, having
due regard to all the circumstances of the *case*, not as under
our law having regard merely to the situation of the family
and the value and circumstances of the *estate*. Regard for the
circumstances of the *case* includes, as was held in *Hollenbeck*
v. *Pixley*, 3 Gray, 521, so largely relied upon by the majority,
a consideration of the former relations between the widow
and her deceased husband, the amount of the wife's separate
estate and many other circumstances which are excluded
from the consideration of the probate court in Rhode Island;
but which this Massachusetts case says should be con-
sidered there as part of the circumstances of the *case*.
Thus it will be seen that while the Rhode Island probate
court is positively directed to grant to the widow an allow-
ance for her support, for the time limited, in accordance with
the situation of the family and the value and circumstances
of the estate, the Massachusetts probate court is simply
given the discretion to make such allowance as it may see
fit for necessaries. And the Massachusetts court in some
cases has interpreted "necessaries" as meaning actual
immediate necessities.

The majority takes some expressions, which are merely
dicta, contained in the opinion of Chief Justice Shaw in
*Hollenbeck* v. *Pixley, supra,* and from them draws the
conclusion that the Massachusetts court has given a very
restricted and narrow construction to the statute, an
example of these is the expression "it is a question solely
of her actual necessities;" but the majority opinion over-
looks the fact that the Massachusetts court was not deciding
that question at all, and the majority opinion fails to note

the liberal practice, which has grown up in Massachusetts under the statute, as shown in the reports. The majority opinion refers to *Hollenbeck* v. *Pixley* as the leading case, but does not say as to what principle it is the leading case. The facts of that case were that the widow and her deceased husband had lived apart for many years before his death. Eight years before his death the parties entered into articles of separation by which they covenanted to live apart for the future and she and her trustee covenanted that she should not claim dower or distributive share in her husband's estate. In these circumstances the judge of probate declined to make an allowance to the widow and the case decides simply and solely that those facts were circumstances in the case which the probate court, under the statute, was entitled to consider. A large portion of the opinion in the *Hollenbeck* case, quoted at length by the majority had no bearing on the point which was at issue in that case and if those excerpts, which are purely dicta, are taken by the majority as showing that a narrow construction has been placed upon the Massachusetts statute in the practice of that state, such view is not supported by the later decisions.

In the later case of *Slack* v. *Slack*, 123 Mass. 443, the widow had lived apart from her deceased husband for fifteen years before his death, yet the court would not disturb an allowance of $350 to the widow, although the administratrix claimed that such allowance would exhaust the estate. In *Chase* v. *Webster*, 168 Mass. 228, it appeared that the deceased husband had obtained a decree of divorce *nisi* against his wife which had not become absolute before his death; that they had lived apart for two years before his death; that she was a dissolute woman of the town, and that the estate amounted to but $900. An allowance of $100 to the widow was supported although, under the statute she would also share in the distribution of his estate. In *Dale* v. *Hanover National Bank*, 155 Mass. 141, it appeared that the estate of the deceased husband was insolvent; that the husband and wife at the time of his death were not

keeping house, but that she was living with her father and was intending to live with him; that her father was a man of property who charged her nothing for board and lodging; and that she had an income of $1,200 a year from her private property. The majority of the court allowed the widow $500, and the minority desired to make a much larger allowance. As illustrating the misconception that a strict practice prevails in Massachusetts of granting to widows an allowance merely to-meet their actual temporary necessities it should be noted that at the hearing in *Dale* v. *Bank*, *supra*, a certificate was in evidence from the assistant registrar of probate for Suffolk county showing that for twelve years before that time there had been about one hundred and twenty-five probate cases in Suffolk county in which widows' allowances had been fixed at $2,000 or over, the highest being $10,000. In *Dale* v. *Bank*, *supra*, Mr. Justice Morton, in a dissenting opinion reviews at length the Massachusetts practice and the course of decision with reference to widows' allowances in that state and says, "the statute has always been construed liberally in favor of the widow" and her claim has been regarded as higher than any other claims against her husband's estate except perhaps taxes. He points out that notwithstanding the allowance has been spoken of in illustration as "a temporary relief to her immediate necessities on her husband's death" . . . "in no case has the allowance been limited to her actual necessities, meaning by that food, clothing, shelter, and the comforts and attendance which her physical condition may have required, nor confined to her temporary necessities, using these words in their ordinary sense. The word 'necessaries' has been construed in practice to include these and much more. Her actual necessities have been measured by her husband's wealth, his social position and her own, the demands which these would entail upon her, her age, health, habits, mode of life, and other like matters. The interests of heirs and creditors have never been suffered to interfere with her claim." This view of the Massachu-

setts practice is amply supported by the evidence in the *Dale* case and the Massachusetts cases discussed in that opinion.

The majority opinion does not expressly decide, that because the petitioner at bar has some private means and an income of her own which may perhaps be sufficient for her bare subsistence, the probate court was not justified in granting the allowance; but said opinion does refer from time to time to the amount of her private estate and income as to a matter of important consideration and also to the fact that her husband made a certain gift to her in his lifetime. This gift was a very small one when we consider the large amount of the husband's fortune and income and appears to have been a gift without condition. It absolutely belonged to her at the time of his death. If the amount of her own separate estate would not bar an allowance by the probate court the frequent consideration of the amount of her own means tends to confuse the issue before us. If the majority, however, intend to hold that the possession of a personal income from her own estate in any way prevents the exercise of the discretion of the probate court in granting her an allowance from a large and solvent estate, such holding would be contrary to the weight of authority in this country and would insert into our procedure a limitation and condition not contained in our statute.

It therefore appears to me that the imperative language of the statute required the probate court to make a reasonable allowance for this widow's support, in any event, until the provisions made for her by her husband's will first becomes payable to her, and in case that is insufficient for the full support to which she is entitled under the statute then such allowance for the space of six months as shall together with the provisions under the will make up the full sum of an adequate allowance for six months' support.

The majority have disregarded the decree of the probate court and have reversed the finding of the jury and the decision of the justice of the Superior Court and have said

that the petitioner is entitled to no allowance whatever. This appears to me to be unjustified in any view of the case. The deceased died on the 26th of April, 1913, the first payment of income to the widow under the testator's will was not due until July 26th, 1913, and was not in fact paid to her by the trustee until August 8th, 1913. So that from the 26th of April, 1913, until August 8th, 1913, the widow was entirely without means of support from her husband's estate. It is not enough to say that later, on July 26th, or on August 8th, she was to receive a provision for her support which she might apply to the period which had then elapsed. The purpose of these statutory provisions, universally recognized, is not to compensate the widow for a failure on the part of her husband to provide for her in his will, but to furnish her with immediate assistance and support. If the opinion of the majority states the true rule then in no case would the widow be entitled to an allowance if the testator had made provision for her in his will by bequest or devise or if she was to receive a distributive share of the estate, in either case sufficient in amount to cover six months' support; for it could then be said that when she received such benefit from her husband's estate she could apply it to her six months' support. This is entirely contrary to the authority of many well considered cases.

In the case, *In re Walkerley*, 77 Cal. 642, it appeared that "By the codicil, executed shortly before his death, deceased, on learning that a child was to be born to him, and as is therein stated for the purpose of providing for such child, 'and to make a more liberal provision for my said wife than I have made in my will,' annulled the provisions in the original will relating to his wife, and in lieu thereof gave and bequeathed to her the sum of one hundred thousand dollars, to be paid to her when certain property is sold as by the will directed, and in the meantime to be and remain a lien upon such property, bearing interest at five per cent. per annum, said interest to be paid to her semi-annually." The court considers the California statute with reference to

allowances for widows and finds therein its power to "provide for the decent support and maintenance of the family, until, in due course of administration, they can become the recipients of the share of the estate to which they are entitled as heirs, or otherwise." The court then says: "That this provision should cease when the widow comes into such share of the estate as renders it no longer necessary, is no argument against the power to make and continue it until that event happens, which we may well assume will be upon receipt of the first installment of interest."

In *Williams* v. *Williams*, 5 Gray, 24, while Chief Justice Shaw who wrote the opinion of the court in the *Hollenbeck* case was still a member of the court, the court held that: "Under St. 1838, c. 145, the probate court may grant an allowance to a widow out of the personal estate of her deceased husband, although a provision has been made for her by will in lieu of dower and accepted by her, and although the executor, being also residuary legatee, has given bond as such to pay debts and legacies." It may be noted in passing that the provision in her husband's will for the petitioner in the case at bar was in lieu of dower and accepted by her as such.

In *Allen* v. *Allen*, 117 Mass. 27, it appeared that "An intestate left a widow, five children by a former wife, personal estate amounting, after payment of debts, to $9,000, and real estate of the value of $13,000 or somewhat more, in which the widow had dower. The widow remained in his house for ten weeks, and the administrator paid the expenses out of the estate. He also provided her from time to time with all the money she wished, and charged it to her distributive share. The probate court, two years after the death of the husband, upon the application of the widow, made her an allowance of $800." It was held that the decree of the probate court should be affirmed.

In *Meech* v. *Weston et al.*, 33 Vt. 561, "The oratrix was bequeathed a legacy and annuity by her husband's will. She, in good faith, appealed from the allowance of the will

by the probate court, and during the pendency of the appeal the probate court allowed her unconditionally a certain sum from the estate for her support under Sec. 29, Chap. 48, Comp. Stat. page 330; and the same was accordingly paid to her. The will was subsequently established. *Held,* that this allowance was independent of her legacy and annuity under the will, and that the executors or heirs could not treat it as in part payment thereof."

The majority has reversed the special finding of the jury, approved by the justice of the Superior Court, and by its final action in effect says that said finding is entirely without evidence to support it. The special finding was that the provision of the will of Lyman R. Hopkins contemplating the payment to his widow of $2,000.00 and the use of the house in Brooklyn and its furnishings during the first six months after his death, is not a reasonable provision for continuance of her support during that period. This was a material question, it was so considered by the appellant, the Trust Company, for said special finding was requested by it. It seems plain that unless the provision referred to in the special finding constituted a reasonable provision for the widow's support during said period of six months then she was unprovided with reasonable support from her husband's estate during said period. This was purely a question of fact peculiarly within the province of the jury; it was a question presented to their sound discretion as men of experience in the ordinary affairs of life. Their finding should not be reversed unless it clearly appears that there has been an abuse of discretion. It is not enough to say that the finding is contrary to the conclusion which this court might make upon the evidence, for then this court might order a new trial, but to order a judgment, contrary to the finding of the jury, this court must go farther and say that there is no legal evidence upon which a rational mind could so find. The jury's finding, however, is in accordance with the determination of the judge of probate, and it has been approved by the justice of the Superior Court. After a

consideration of all the circumstances shown in the testimony I would not disturb the jury's finding that $2,000 did not amount to a reasonable support for the widow during said period. The personal property of this estate, consisting almost entirely of interest bearing bonds and stocks, was inventoried at one million one hundred and ninety-three thousand two hundred and six dollars, upon what the officer of the appellant said was a conservative valuation. There was some real estate owned by the deceased at the time of his death. There does not appear to have been any debts due from said estate. With an estate of over twelve hundred thousand dollars, having an annual income of over fifty thousand dollars, upon the widow's application, the probate court in the first instance, and later the jury, were called upon in their discretion to say what was a reasonable allowance from said estate in accordance with its value for the widow's six months' support. The point we are now considering is whether the finding that $2,000 and the use of the homestead is not such a reasonable allowance, is a finding that no reasonable mind could fairly make. The appellant urges that the standard of support to be applied in this case is the manner of support that the deceased imposed upon himself and his wife during his life. And the majority have adopted that doctrine. It does not appear to me that we have sufficient evidence to satisfactorily determine what was Mr. Hopkins' expenditures for the support of his family; although it does clearly appear that his manner of living was far below that of the ordinary man having his large fortune and income; and that he deprived himself and his wife of many of the comforts, conveniences and the reasonable enjoyments of life to which this petitioner was entitled as the faithful partner of a husband having such great wealth. From the testimony the jury might believe the following facts: Mr. and Mrs. Hopkins lived in what is described as a fine residential section of Brooklyn, N. Y., in a very large house, entailing much care and work for its proper keeping; although the

petitioner was not in vigorous health and was becoming old, he permitted her to have but one servant; he permitted the home to become out of repair; the heating apparatus was insufficient to warm the house; the plumbing was defective; some of the ceilings had fallen, the window sashes were loose and much of the putty had fallen out of them; during his last illness of over two years he employed no nurse, although his condition clearly required one, but he permitted his wife to be his sole attendant until she broke down and collapsed with nervous exhaustion, and for the remainder of his life he was attended by his wife and a Swedish servant girl. From these and many other facts the jury might find that Mr. Hopkins in his lifetime did not furnish to his wife support in accordance with his means. We are not justified in saying that it was an abuse of the jury's discretion if they refused to be governed entirely by that standard and fixed the amount of the allowance as the statute directs having regard to the value and circumstances of the estate. It cannot be said that that manner of living was satisfactory to Mrs. Hopkins, for although she submitted to it she testified and the evidence is uncontradicted that she was unaware of the great wealth of Mr. Hopkins; that he had always kept her in ignorance of it. Speaking of their manner of living she testified: "Well, that is the way I had to live, pretty saving; he always told me I must be very saving;" and later in answer to the question if she knew about the amount of her husband's wealth, she testified: "No, sir, I did not. He always made me believe that he had to live very saving."

The testator gave to his wife the use of his homestead in Brooklyn and its furnishings. It is reasonable that she should use it as her home. It appears in testimony that it is a brown stone house covering the front of a lot ninety feet wide on the street and is three stories high with a basement; the jury might find that it was entirely out of repair. The jury were at liberty to find in the circumstances of this estate that it would not be an unreasonable item of support that

the petitioner keep said house in repair and live in it somewhat in accordance with the manner of living of her neighbors; that she might employ such servants as the proper maintenance of the house would require, that she should have the privilege of entertaining her relatives at her home to a reasonable extent. The jury might find from the testimony that she needed the frequent attendance of a physician and that she was entitled to have the highest medical care; that she constantly needed an attendant to care for her; that she should have the use of a private conveyance to a reasonable extent; that she should be furnished with the means to go to some place out of Brooklyn during the heat of summer; that she should have clothing and food suitable to her condition and her reasonable desires; and that generally in her declining years she should have the means of providing for herself the reasonable comforts and enjoyments appropriate to her age and state of health and in accordance with the very ample means of her husband's estate. It is true that after said six months she will be restricted to the provision made for her in the will, for the will has been probated. But during the first six months after his decease the statute has placed it in the discretion of the probate court and upon appeal in the discretion of the Superior Court or a jury to say what is a reasonable allowance for the widow's support. I feel that this court is not justified in saying that the evidence presents no circumstance which could fairly move the discretion of the jury in finding that the sum of four thousand dollars per year did not constitute a reasonable provision for this widow's support.

It would be within the province of this court if upon a consideration of the testimony it should regard the finding of the jury excessive in amount to fix upon a reasonable sum and order a new trial unless the petitioner should remit all in excess of such sum. I am forced to the conclusion that the evidence does not warrant this court in substituting its

judgment for the discretion of the jury and directing the entry of a decree dismissing the petition.

JOHNSON, C. J., concurs in this opinion.

*Tillinghast & Collins, Harold B. Tanner,* for appellant.

*James C. Collins,* of counsel.

*Quinn & Kernan,* for appellee.